## MAGEE v. STATE.

(In Banc. April 26, 1948. Suggestion of Error Overruled June 14, 1948.)

[35 So. (2d) 310. No. 36674.]

M. Ney Williams, of Raymond, and H. C. Stringer, of Jackson, for appellant.

Greek L. Rice, Attorney General, by R. O. Arrington, Assistant Attorney General, and Ross R. Barnett, of Jackson, for appellee.

Argued orally by H. C. Stringer, for appellant, and by Ross R. Barnett, for appellee.

**McGehee, J.**, delivered the opinion of the court.

This is the third appeal by Sandy Magee from a death sentence for the alleged murder of Ernest Conn on the night of February 23, 1944, immediately following a struggle in his cafe over the possession of the loaded pistol of the deceased which he had drawn on the defendant under the circumstances hereinafter set forth.

We regret exceedingly the necessity for again ordering a new trial. We would be most reluctant to do so on mere technicality, even if there had been only one trial. The marked increase of homicides throughout the land renders it expedient that this case should not be again reversed without sufficient comment on the evidence to fully justify such action.

The case was reversed on the first appeal because of certain prejudicially incompetent testimony introduced against the accused, which, in our opinion, furnished the only reasonable explanation on the evidence then before us for the imposition of such an extreme penalty. We did not at that time discuss the merits of the case but merely ordered a new trial. Magee v. State, 198 Miss. 642, 22 So. (2d) 245.

This homicide was not committed in furtherance of a robbery, or as an assassination, or otherwise in pursuance of a premeditated design and purpose to take human life. It occurred, according to all of the creditable evidence, at the end of a continuous struggle or tussle for possession of the pistol of the deceased after he had drawn it on the defendant, and after the defendant had also been dazed by a blow at the hands of an employee of the deceased. Much less than three minutes transpired from the beginning of the difficulty until the fatal shooting.

On the second appeal, the case was reversed for the reason that, after a most thorough study of the evidence disclosed by the record then before us, four of the Judges entertained a ''serious doubt whether the charge

should be allowed to stand for a higher offense than manslaughter.'' We stated in the opinion then rendered that ''it did not occur to us that with that evidence (the incompetent evidence on the first trial) eliminated, any properly selected jury, wholly without bias, would (again) return a verdict authorizing the infliction of the death penalty.'' Magee v. State, 200 Miss. 861, 28 So. (2d) 854. The opinion also stated that ''All of us concur that the present record does not justify the death penalty, some of us feeling that the execution of a death sentence under the record in this case would be a reproach upon justice.''

Whether the foregoing expressions now constitute ''the law of the case'' or not, they should be largely determinative of the issue now involved unless on the present appeal the proof is substantially different in its material aspects from that relied on by the prosecution in the second trial. The only substantial variances in the two records are (1) that cumulative testimony was offered on the last trial to that heretofore given on the issue as to whether the defendant's brother Charlie Lee Magee had left the imprint of his fingernails on the shoulders of Mr. Conn during the struggle for the possition of the latter's pistol after it had been discharged into the ceiling of the cafe room where the defendant Sandy Magee had been assaulted by him with the said weapon; and (2) that one Mattie Jacobs, a former employee of the deceased, had testified positively and unequivocally on the second trial that when she came to the scene of the killing ''I was by myself,'' whereas, on the third trial she swore that she came there with the State's star witness Stokes, whose presence at the scene at all is seriously questioned, as will be hereinafter shown by reference to the testimony of a number of the State's other witnesses, as well as to his own statements in regard thereto. The result is that, in our opinion, the case now

made against the accused is either one of manslaughter or self-defense.

The only eyewitness who contradicted the testimony of the defendant and his brother as to how the fatal shooting occurred in front of the cafe in semi-darkness was the witness Stokes who claimed that he had been standing at the side of the cafe door for fifteen or twenty minutes when he saw the defendant Sandy Magee come out of the cafe first with the "small pistol" in his hand, followed immediately by his brother and Mr. Conn who were in a tussle or struggle. The pistol which had been drawn on the defendant and discharged in the cafe was a Colt forty-five caliber automatic. Stokes testified positively and unequivocably that while he was standing there no other person either entered or came out of the cafe, whereas the State had already proved by its other witnesses, Edna Fultz, Joe Austin, Ellry Dickson and Frank Terry, that they had come out of the cafe during this interval in advance of the exit of the defendant and his brother Charlie Lee Magee and the deceased, and had proved by its witness Joe Austin that he and his wife, his brother-in-law and his wife, all had entered the cafe at this door only about three minutes before that time.

The State undertook to corroborate the testimony of the witness Stokes as to whether he was there or not by the witness Jim Meyers, but this witness placed himself and Stokes at the front of a barber shop which was approximately twenty-five feet from the cafe door. The other witnesses for State do not claim to have seen either of them there at all, nor did Stokes see any one else, although these other State witnesses admittedly came out ahead during the tussle over the Conn pistol, the witness Joe Austin having gone to the front of the barber shop before hiding for safety between some automobiles.

The witness Mattie Jacobs, who was admittedly an intimate associate and affinity of the witness Stokes, and who had testified on the second trial that she came to the cafe "by myself," and on the last trial that she came,

there with the said Stokes as aforesaid, testified on both of these trials that the defendant got Mr. Conn's pistol away from him in the cafe. None of the numerous other witnesses who testified in detail about what occurred in the cafe ever claimed that the defendant or anyone else gained possession of the Conn pistol in the cafe or elsewhere, before he was shot. On the second trial, this witness testified to this alleged fact in response to the following leading question: "What happened to Mr. Ernest's gun there in the cafe, who got it?," and she answered "Sandy." No one had at that time testified that Mr. Conn's gun was taken away from him by any one in the cafe, although Mrs. Conn and others were observing what was taking place and there were some seventy-five to one hundred Negroes present in the colored section of the cafe at the time the controversy arose, and while Mr. Conn was drawing his pistol on the defendant. Of course, almost all of them got out of the cafe as quickly as possible, several of them ahead of those engaged in the tussle. However, some of them would necessarily have seen the defendant get the Conn pistol if he had done so, and at least a few of them would have been seen by the witness Stokes as they ran out if he had been at the side of the door of the cafe.

The witness Mattie Jacobs on the second trial had also been asked the question: "Where was Charlie Lee at the time the shots were fired?," and she answered "going on out." Whereas, the witness Stokes testified that Charlie Lee was holding Mr. Conn on the outside when the shots were fired out there. The only other shot which had been fired was on the inside when Mr. Conn's pistol was discharged into the ceiling as the defendant knocked it up and caught Mr. Conn's hand.

The witness Stokes testified on the second trial that he saw the defendant with the pistol as the latter came out into the narrow hallway or passage, which was twenty-three feet in length, but it is so obvious that he could not have looked that distance down the narrow passage from

either five or six feet to the side of the front entrance where he then said he was standing, or from in front of the barber shop where Jim Myers said they were seated that he merely said on the last trial; he saw the defendant as he came out the front door.

The witness Covington, an employee of the deceased, who had broken a beer bottle into pieces over the head of the defendant immediately after the Conn pistol was discharged into the ceiling was asked the question: "Is it not a fact then that Sandy took his pistol away from him when he shot in the ceiling and took it out ahead of Mr. Conn?," and he answered "I don't know about that, I did not see him take it. He had testified in detail as to what had occurred during the entire controversy in the cafe, after the pistol was drawn. This witness also contradicted the star witness Stokes who claimed that the defendant Sandy Magee came out of the cafe ahead with a pistol in his hand, when he was asked the question "That couldn't be true?," and he answered "No, sir." He knew that they had struggled through the hallway and out of the door; that the defendant was in this struggle throughout its duration.

On the second trial), Mrs. Conn, the wife of the deceased (who did not testify on the last trial, being unable to be present as a witness,) testified that she saw the defendant Sandy Magee and others tusseling with her husband down the hall toward the front door of the cafe, and she was asked this question: "The last time you saw Mr. Conn he had the pistol?," and she answered: "Yes."

Therefore, we are of the opinion, after an exhaustive study of all of the testimony, that any finding of fact to the effect that Mr. Conn did not still have possession of his pistol when they got on the outside of the cafe where he was shot and killed by the defendant would not be supported by such substantial evidence as would warrant a conviction of murder.

The killing occurred immediately following the struggle over the possession of the pistol of the deceased. It was shown that Mr. Conn was the aggressor in the difficulty insofar as he and the defendant were concerned, since he drew his cocked pistol on the defendant at a time when the latter was molesting no one and was not guilty of the slightest misbehavior. The defendant who was neither drunk nor drinking, and who was not responsible for the disturbance created in the cafe by his drunken brother Charlie Lee Magee, had merely removed his brother's pistol from his pocket after the latter had stumbled or had been pushed to the floor, placing the same in his own side coat pocket, and this action of the defendant in so doing was proper. The defendant had the right to move toward Mr. Conn as the latter backed away with a drawn pistol, so that he could stay in an arm's reach of the pistol until he had an opportunity to catch Mr. Conn's hand. Any other person present also had the right to take hold of Mr. Conn and aid in disarming him, since the defendant, according to all of the testimony, had made no effort to draw from his own side coat pocket the pistol which he had placed there upon removing the same from his drunken brother's pocket, and was not otherwise trying to do Mr. Conn any harm as the struggle continued for possession of the Conn pistol. If it be true that when they got on the outside of the cafe Mr. Conn shook the defendant loose from him and tried to shoot him with the pistol, the defendant had the right to use such force as may have reasonably appeared to him to be necessary in order to protect his own life. The issue is then whether or not the defendant used greater force than reasonably appeared to be necessary to protect his own life, or committed the homicide in his necessary self-defense.

The defendant and his brother testified that when the defendant was thrown loose from Mr. Conn, and while the latter was standing over him trying to shoot him, the defendant fired the three shots while down on one knee. The doctor who examined the deceased testified that one

bullet entered the arm or shoulder, went in and came out and then went in and came out again, ranging upward, and that the fatal shot entered the lower part of the stomach and lodged up under the liver, thus corroborating the version of the defendant and his brother as to the respective positions of the combatants. The defendant also testified that he then picked up Mr. Conn's pistol from the ground near the body and carried it away with him to where he and his brother telephoned an officer and surrendered.

The officer testified that Mr. Conn's pistol was "jammed," that is to say, it did not throw out the empty shell which had been discharged in the cafe, and would not therefore reload itself. There is no proof, however, that the defendant knew that it wouldn't shoot again.

The defendant's rights were evidently prejudiced in the minds of the jurors by the conduct of the codefendant, Charlie Lee Magee, who in his drunken condition had used profane, vulgar and indecent language inside the cafe in the presence and hearing of Mrs. Conn; but his drunken condition, and that of several others, was produced by the intoxicants which they purchased at the cafe while they listened to the audiphone playing there on that Sabbath evening.

To affirm a sentence of death under these circumstances would be to sanction taking the life of one who, under the record now before us, in our opinion, is at most guilty of no greater offense than that of manslaughter.

It is true that an appellate court has nothing to do with whether or not a death sentence shall be imposed where an accused has been properly convicted of murder but it does have the final responsibility of saying whether or not an accused shall be put to death for an offense which does not carry a greater penalty under the law than a maximum sentence of twenty years imprisonment.

We therefore reverse and remand the case for the reason that the defendant was entitled to have the jury instructed that in no event could he be convicted of a great-

er offense than that of manslaughter, as requested by him at the conclusion of the evidence.

Reversed and remanded.

**Roberds, J.,** dissenting.

**Sydney Smith C. J.,** delivered a partially concurring opinion.

The deceased when only a few feet from the appellant was attempting to disarm him by threatening him with a pistol pointed directly at him, in violation of Section 2013, Code of 1942. The homicide occurred either while the appellant was resisting this attempt to disarm him or immediately after the attempt had failed. In either event, since the evidence does not disclose that he bore any malice toward the deceased prior to the attempt of the deceased to disarm him, he is guilty only of manslaughter under Section 2225, Code 1942, which provides: "Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter." Williams v. State, 120 Miss. 604, 610, 82 So. 318, Dissenting Opinion adopted on Suggestion of Error as the opinion of the Court in Williams v. State, 122 Miss. 151, 84 So. 8; Fletcher v. State, 129 Miss. 207, 91 So. 338; Walker v. State, 188 Miss. 177, 189 So. 804; Williams v. State, 127 Miss. 851, 90 So. 705; Bergman v. State, 160 Miss. 65, 133 So. 208; Bangren v. State, 196 Miss. 887, 897, 17 So. (2d) 599; Bowen v. State, 164 Miss. 225, 235, 144 So. 230, 232; Jones v. State, 170 Miss. 581, 155 So. 430.

Consequently, the Court below erred in not granting the appellant's request for an instruction charging the jury "that you can not convict him (the defendant) of any crime greater than manslaughter." I concur, therefore, in reversing the judgment of the court below, but

only on the ground that it should have granted this instruction.

**Roberds, J.,** delivered a dissenting opinion.

When this case was last before this Court, 200 Miss. 861, 28 So. (2d) 854, I was of the opinion, and then so stated, that the guilt or innocence of defendant, and, if guilty, the degree thereof, were questions for the jury to decide. I am of that opinion on the record before us now. In fact, the case as made on this trial is perhaps stronger in favor of the State than in the former trial. The evidence of the State showed defendant to be guilty of murder. The jury had a right to believe that evidence.